STATE OF NORTH CAROLINA v. GEORGE McCALL RICK

No. 46

(Filed 3 November 1981)

**Criminal Law § 34.4 — evidence of other offenses — admissible**

    In a prosecution for first degree rape in which defendant threatened the prosecuting witness with a kitchen knife and raped her after he arrived at her house bleeding and seeking transportation, evidence that defendant accosted and choked a woman in a parking lot approximately four hours prior to the

crime charged and evidence that he robbed, choked and forced another woman to remove her clothes and took her knife and car approximately one-half hour later was properly admitted and relevant as a part of the chain of circumstances leading up to the matter on trial and to show a common plan or scheme to commit the subsequent crime.

DEFENDANT appeals from decision of the Court of Appeals reported in 51 N.C. App. 383, 276 S.E. 2d 768 (1981), upholding judgment of *Lewis, J.,* entered at the 16 June 1980 Session of Lincoln Superior Court.

Defendant was tried upon a bill of indictment, proper in form, charging him with the first degree rape of Brenda Lee Allen on 11 March 1980 in Lincoln County.

Mrs. Susan Diane Cogdill testified that shortly after 5 p.m. on 11 March 1980 defendant accosted her in the parking lot of the Belmont Armory as she sat in her automobile. Defendant attempted to force his way into the car by choking her. She resisted his attack and told her little girl to go for help. Mrs. Cogdill began screaming and defendant, apparently frightened, abandoned the struggle and fled into the nearby woods.

Mrs. Carrie Jenkins testified that on 11 March 1980 between 5 and 5:30 p.m. she had just returned home from the grocery store. Shortly thereafter, defendant walked into her house. He didn't knock but just walked in and inquired if Mrs. Jenkins was alone. She replied in the affirmative and defendant said he was going to rob her. She said she had no money whereupon defendant took her by the shoulders, raised her out of the chair, walked her backward into a bedroom and shoved her down on the bed. He told Mrs. Jenkins to pull off her clothing, and when she sat up to unbutton her blouse he slapped her across the face with the back of his hand and broke her glasses. Defendant then ripped her blouse and tore it off her body with the exception of the cuffs. He asked her for her car keys and she told him they were on the table. When he returned to the bedroom, he had a knife and used it to cut her bra in two. He then cut down the side of her other clothes so that she was entirely nude except the blouse cuffs still on her arms. Defendant then cut one of her blankets and used the pieces to tie her hands and legs together. He then went outside and attempted to start the car but failed because he didn't know which key to use. He returned to the house, choked Mrs. Jenkins, forced her to show him which key started the car, then left. She

opened the drapes and saw defendant drive her car away at about 6 p.m. The assault and theft was reported and officers called her about 9:30 that night and said her car had been found wrecked in Lincoln County.

Brenda Lee Allen, aged eighteen, testified that on and prior to 11 March 1980 she did not know defendant personally but had known his wife Tina because they had attended Central High School in Lincolnton together. Around 9 p.m. on that date, defendant telephoned her that Tina wanted to talk with her—it was important. She told him to tell Tina to come to her house because she did not know where Tina lived. Shortly thereafter, Brenda's stepfather answered a knock on the door and admitted the defendant George Rick. His wife Tina was not there. Rick had blood on his hands and wanted to use the phone to call Tina to come and get him. He made a phone call and told "whoever it was" to meet him at Winn-Dixie which was about a quarter mile up the road from Brenda's home.

After the phone call, defendant said, "Could I talk to you?" Brenda agreed and went outside thinking they would just sit on the steps and talk, but defendant continued walking and Brenda walked beside him. She returned to get her coat because it was getting cold. They walked back up the driveway above the trailers in the park, whereupon defendant exhibited a knife "which looked like a steak knife," suddenly threw her on the ground and put the knife to her throat. He told her to take her pants off or he would kill her. She pulled the knife away from her face and defendant started choking her with his hands. He choked her so much she "couldn't say a word." Finally, he said: "Now take your pants off before I kill you." In the struggle, he had lost the knife—"It went flying in the air somewhere and I was scared he would find it again." Brenda thereupon removed her pants and defendant had sexual intercourse with her by force and against her will.

After the rape was completed, defendant got up and said he needed to call Tina to come and get him. They walked back down the roadway of the trailer park and used a neighbor's phone to call defendant's wife who eventually picked him up and took him away. Brenda then called the sheriff's department and reported the rape. When the deputies arrived, she said she had been raped by George Rick. She went with Officer Beam to the area where

the rape occurred, and they found the knife in the bushes. Brenda's car keys, which she had lost, were also found in the area where the rape occurred. Both items were offered in evidence. Brenda testified that when she found herself on the ground, "George Rick had the knife in his left hand and had his left hand around my neck. When we started wrestling, he lost the knife." She denied she had ever had intercourse with defendant prior to this occasion but admitted sexual relations with four other men, naming them.

Defendant, twenty-nine years of age, testified in his own behalf. He said that on 11 March 1980, he had known Brenda Allen for three or four months, had partied with her and they had smoked pot and drank beer together. He said he had had sexual relations with her on two occasions prior to 11 March 1980, and on one of those occasions she gave him pictures of herself. When we arrived at her home on 11 March 1980, he was in pain, having cut his fingers and "busted" his nose in a car wreck and was bleeding badly. He used Brenda's phone and asked his mother if she and his sister would come to get him, telling them to meet him at a convenience store near Brenda Allen's home. He made that call around 8:30 p.m. After hanging up, he told Brenda he needed to talk to her and asked her if she would walk up the road with him. She agreed and they left the trailer. He told her about the car wreck and she inquired about Tina. He told her he wasn't sure and believed Tina may have left him. During all that time he had a knife out and was using it to cut skin off his fingers which had been injured in the wreck. She asked him to put the knife away, and he "pitched the knife away." She then asked him to sit down and talk and he agreed. She said she thought she was pregnant and named two different men who might be the father. They eventually started kissing and caressing each other, moved back behind some bushes and had sexual intercourse "to which she voluntarily consented."

Defendant further testified that when they were walking back to Brenda's trailer, he told her he would not be able to see her any more because his wife was pregnant and was suspicious that he was seeing someone else. He informed her he intended to tell his wife about Brenda before she found out from someone else. Brenda thereupon told him "that if I told my wife that I had been seeing her that she would fix it to where I would lose my

wife. When Brenda told me that I slapped her." Defendant said that on the occasion in question he was wearing a black vinyl jacket, a black T-shirt, a pair of Wrangler pants, and a cowboy hat. His wife came in about fifteen minutes and he left with her.

Defendant admitted on cross-examination that he was picked up in Charlotte that night at his sister's apartment after the alleged rape; that he had used marijuana; that in July 1971 he was represented by a lawyer and pled guilty to the rape of his sister-in-law; that in 1975 he pled guilty to larceny of a tape player, assault on a female, and reckless driving. He denied that he choked Mrs. Susan Cogdill at the Belmont Armory on 11 March 1980 but admitted he went to the home of Mrs. Carrie Jenkins on that date, threw her down on the bed, cut her clothing off, tied her up, and stole her car. He denied that he choked her and stated he had been drinking earlier that morning.

The jury convicted defendant of second degree rape and he was sentenced to a prison term of not less than twenty nor more than twenty-five years. The Court of Appeals found no error with Webb, J., dissenting. Defendant appealed to the Supreme Court as of right pursuant to G.S. 7A-30(2), assigning errors discussed in the opinion.

*Rufus L. Edmisten, Attorney General, by Richard L. Griffin, Assistant Attorney General, for the State.*

*T. M. Shuford, Jr., attorney for defendant appellant.*

HUSKINS, Justice.

Did the trial court err in admitting the testimony of Mrs. Cogdill and Mrs. Jenkins? Answer to the question posed disposes of this appeal.

Defendant contends the challenged testimony was evidence of distinct, independent and separate offenses, and thus incompetent in the trial of this case, citing *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954). The State contends the testimony of Mrs. Cogdill and Mrs. Jenkins was competent, relying upon the exceptions to the rule contained in *State v. McClain,* supra, and citing in support of its position *State v. Arnold,* 284 N.C. 41, 199 S.E. 2d 423 (1973); *State v. Humphrey,* 283 N.C. 570, 196 S.E. 2d 516, *cert. denied,* 414 U.S. 1042, 38 L.Ed. 2d 334, 94 S.Ct. 546 (1973); *State v.*

*McClain,* 282 N.C. 357, 193 S.E. 2d 108 (1972). These conflicting contentions will now be examined in light of the authorities relied upon by the respective parties.

In a prosecution for a particular crime, it is the general rule that the State cannot offer evidence tending to show that the accused has committed another distinct, independent or separate offense. Even so, various exceptions to this general rule are as well recognized as the rule itself. See *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954), where the rule and the exceptions are discussed and documented. The sixth exception listed in *McClain* reads as follows:

> 6. Evidence of other crimes is admissible when it tends to establish a common plan or scheme embracing the commission of a series of crimes so related to each other that proof of one or more tends to prove the crime charged and to connect the accused with its commission. [Citations omitted.] Evidence of other crimes receivable under this exception is ordinarily admissible under the other exceptions which sanction the use of such evidence to show criminal intent, guilty knowledge, or identity.

*Stansbury* expresses the rule as follows:

> Evidence of other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged; but if it tends to prove any other relevant fact it will not be excluded merely because it also shows him to have been guilty of an independent crime.

1 Stansbury's North Carolina Evidence, § 91 (Brandis rev. 1973). Thus, proof of commission of other offenses may be competent to show the state of mind, intent, design, guilty knowledge or *scienter,* or to make out the *res gestae,* "or to exhibit a chain of circumstances in respect of the matter on trial, when such crimes are so connected with the offense charged as to throw light upon one or more of these questions." *State v. Humphrey,* 283 N.C. 570, 196 S.E. 2d 516 (1973). *Accord, State v. Jenerett,* 281 N.C. 81, 187 S.E. 2d 735 (1972); *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969), *rev'd on other grounds,* 403 U.S. 948, 29 L.Ed. 2d 859, 91 S.Ct. 2283 (1971).

Defendant's contention that these two earlier assaults were so dissimilar to the attack on Miss Allen as to fail to provide evidence of a common scheme or plan is not without some merit. Neither Mrs. Cogdill nor Mrs. Jenkins was raped. These two assaults took place in a different county from the rape of Miss Allen, and they occurred four hours beforehand. Defendant emphasizes that after cutting Mrs. Jenkins' clothes off and tying her on her bed, he left without raping her. Whether such conduct had "sexual overtones" is, for the present, left to experts in the field of deviant psychology. The attack against Mrs. Cogdill may or may not have been sexual in nature. Her resistance enabled her to escape before defendant's intentions could be manifested.

A defendant's conduct need not be identical to his actions in the crime charged to constitute evidence of a scheme or plan to commit that offense. Sometimes, however, the similarities are striking. *See State v. Arnold*, 284 N.C. 41, 199 S.E. 2d 423 (1973); *State v. McClain*, 282 N.C. 337, 193 S.E. 2d 108 (1972). Here, all crimes committed against Mrs. Cogdill, Mrs. Jenkins and Miss Allen took place within a four-hour period, involved an assault on a lone woman, and were accomplished or attempted by choking the victim into submission. Whether the requisite degree of relevancy exists in this case would be a close question were it not for other pertinent facts.

This case is similar to *State v. Jenerett*, 281 N.C. 81, 187 S.E. 2d 735 (1972). Defendant therein was convicted of felony murder pursuant to the robbery of a grocery store. We upheld the admission of Jenerett's statement in which he confessed to a series of actions logistically and chronologically paralleling those in the case *sub judice*. He admitted entering one store on the morning in question with the intention of robbing it. He failed to carry out his plan because there was a customer present who knew his accomplice. He then entered a second store to rob it, yet changed his mind because "the lady who ran that store looked so pitiful." Jenerett was tried for a felony murder which occurred during his robbery of a third store at 1:30 p.m. that same day. We held this evidence "competent to show defendant's intent to commit a robbery and as a part of the chain of circumstances leading up to the matter on trial. It was also competent to properly develop the evidence in the case at bar." *Id.* at 89, 187 S.E. 2d at 740. So it is

here. The evidence will not be excluded merely because it also shows the commission of other crimes.

Moreover, Mrs. Jenkins' testimony is admissible on more specific grounds. Defendant stole Mrs. Jenkins' car to drive to Miss Allen's house. He also took Mrs. Jenkins' "kitchen knife" and used such a knife to attack Miss Allen. When a defendant uses a stolen instrumentality to carry out a crime, evidence of its theft is admissible to show a plan or scheme to commit the subsequent crime. *State v. Stinson*, 263 N.C. 283, 139 S.E. 2d 558 (1965); *State v. Dail*, 191 N.C. 231, 233, 131 S.E. 573, 574 (1926).

The testimony of Mrs. Jenkins further explains the sequence of events or "chain of circumstances" leading up to defendant's appearance at Miss Allen's home. On his way to Miss Allen's house, defendant wrecked the stolen car. When he arrived at her door, he was bleeding from injuries sustained in this very accident. Since Miss Allen had testified to defendant's injuries, Mrs. Jenkins' testimony is admissible to explain how he arrived, bleeding, on Miss Allen's doorstep.

When Mrs. Jenkins' testimony is admitted, the inclusion of Mrs. Cogdill's testimony is of little consequence and does not constitute prejudicial error.

The decision of the Court of Appeals is

Affirmed.